**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

COMMITTEE OF CONCERNED MIDWEST
FLIGHT ATTENDANTS FOR FAIR AND
EQUITABLE SENIORITY INTEGRATION,
CATHERINE REED, TINA LITKOWSKI,
MEGAN CASH, ASSOCIATION OF FLIGHT
ATTENDANTS CWA AFL-CIO,

                Plaintiffs,

                Case No. 10-C-379

   -vs-

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS AIRLINE DIVISION, TEAMSTERS
LOCAL 135, REPUBLIC AIRLINES, Inc., and
REPUBLIC AIRWAYS HOLDINGS, Inc.,

                Defendants.

# DECISION AND ORDER

This labor dispute arises from the 2009 acquisition of Midwest Airlines by Republic Airways Holdings, Inc. Shortly after the complaint was filed, the parties stipulated to cross-motions for partial summary judgment in lieu of answers and a Rule 16 scheduling conference. The plaintiffs, generally the Committee of Concerned Midwest Flight Attendants for Fair and Equitable Seniority Integration (the "Committee"), move for summary judgment on Count I of the complaint, in which they request a declaratory judgment that the McCaskill-Bond Amendment, 49 U.S.C. § 42112, note, § 117(a), requires seniority integration between Midwest and Republic airline attendants. The International

Brotherhood of Teamsters and its Airline Division (the "IBT" or the Teamsters) cross-move for partial summary judgment on that claim. For the reasons that follow, both motions are denied.

**BACKGROUND**

Midwest Airlines, Inc. – originally named Midwest Express Airlines – began operating out of Milwaukee's General Mitchell International Airport in 1984. Until early 2008, Midwest was a wholly-owned subsidiary of a publicly traded airline holding company named Midwest Air Group (MAG). In January 2008, a private equity fund named the Texas Pacific Group (TPG), along with Northwest Airlines as a minority shareholder, purchased MAG. Upon its purchase by the Texas Pacific Group and Northwest Airlines, MAG became a privately held holding company.

Republic Airways Holdings, Inc. (RAH) is a Delaware public airline holding company. RAH is not itself a certificated air carrier, but instead owns several subsidiary corporations that are themselves certificated air carriers, including Republic Airlines, Chautauqua Airlines, and Shuttle America. Republic Airlines became an FAA-certified air carrier on August 29, 2005, and began scheduled passenger service on September 4, 2005 under code-share agreements with mainline carriers, including Midwest. Each RAH subsidiary holds its own FAA operating certificate.

The IBT, through its Airline Division, is the certified bargaining representative of the flight attendants employed by RAH's subsidiaries. Currently, approximately 1,800 flight attendants are employed by Chautauqua, Shuttle and Republic. Their terms and conditions

of employment are governed by a single collective bargaining agreement, and their seniority rights are governed by that CBA. All flight attendant work performed by and for Chautauqua, Shuttle and Republic falls within the exclusive scope and jurisdiction of the IBT's CBA.

The plaintiff Committee is an association of approximately 200 flight attendants formed for the purpose of advocating for fair and equitable seniority integration of former Midwest flight attendants into the Republic Airways seniority roster. Committee members Catherine Reed, Tina Litkowski, and Megan Cash were hired as flight attendants for Midwest in 1992. Ms. Reed and Ms. Litkowski were furloughed by defendant Republic Airways in 2009, and remain unpaid furloughed employees. Ms. Cash, who volunteered to be furloughed in 2008, was rehired by Republic on September 28, 2009 and is being treated by the defendants as a new-hire employee at the bottom of the seniority list. The Association of Flight Attendants – Communication Workers of America, AFL-CIO (AFA) is the former representative of Midwest flight attendants and a co-plaintiff in this case.

Throughout 2008 and 2009, Midwest experienced severe financial difficulties. Northwest Airlines, the minority shareholding owner of MAG, wrote off its entire investment in MAG in the summer of 2008. The Texas Pacific Group likewise wrote down significant amounts of its investment in MAG. In 2008 and 2009, various entities, including RAH, provided cash infusions to Midwest in order to stave off Midwest's financial demise. Without those cash infusions, Midwest would have run out of its unrestricted cash by September 2008.

In October 2008, Midwest's aircraft fleet consisted of twenty-five B-717s, all of which were leased from the Boeing Company. In order to avoid bankruptcy and likely liquidation, Midwest entered into a forbearance agreement with Boeing. In that forbearance agreement, MAG acknowledged and agreed that it was in default on all of its aircraft leases from Boeing. MAG also agreed to return sixteen of the twenty-five B-717s to Boeing, thereby leaving Midwest with a nine-aircraft fleet of B-717s. Going forward, Midwest's fleet of B-717s was subject to unilateral recall by Boeing at any time.

By March 2009, Midwest's financial condition had worsened. As a result, Midwest approached Boeing in an effort to obtain additional financial concessions, but Boeing refused. Boeing informed Midwest that it had entered into an agreement with a separate carrier, Mexicana, under which Boeing would provide twenty-five B-717s to Mexicana. The twenty-five aircraft involved in the Mexicana transaction were the sixteen that Midwest had already returned to Boeing as part of the October, 2008 forbearance agreement, as well as the remaining nine B-717s that Midwest was still operating at the time. As a result, Midwest faced the loss of its entire remaining fleet of aircraft. However, on or about May 26, 2009, Midwest negotiated an additional forbearance agreement with Boeing. Under that agreement, Midwest was required to return its remaining fleet of nine aircraft to Boeing by early 2010.

By the spring of 2009, Midwest was nearly insolvent. Lacking funds or credit, Midwest was unable to secure financing to purchase or lease aircraft to replace its soon-to-disappear fleet. In a letter dated July 29, 2009 to the Department of Transportation's Air

Carrier Fitness Division, Midwest advised that it was in a precarious financial position and that it was facing an uncertain future.

In June 2009, RAH announced its intention to purchase Midwest from TPG. On July 31, 2009, RAH completed the acquisition of 100% of the stock of Midwest's holding company parent, MAG.[1] Under the terms of the Agreement and Plan of Merger, RAH purchased MAG for $6 million in cash and a $25 million five-year note convertible to 2.5 million shares of stock. Midwest became a wholly-owned subsidiary of RAH. A press release stated that Midwest would "continue to operate as a branded carrier with its longstanding, award-winning commitment to outstanding customer service." D. 10-3, 10-6, Exhibit B, Declaration of Paul Knupp. While leaving some Midwest management in place initially to help with the transition, RAH's management team took control over Midwest aircraft, routes, scheduling, and branding.

Shortly after the RAH-MAG acquisition was finalized, an independent financial advisory firm, Duff & Phelps, reviewed Midwest's financial condition and confirmed that Midwest officially was insolvent, with liabilities that exceeded assets by approximately $273 million. Duff & Phelps further opined that Midwest had been insolvent since May 2009, at the latest, and likely would continue to lose money.

In September 2009, RAH determined that, as a certificated air carrier, Midwest was not a viable enterprise. Accordingly, RAH began to wind-down Midwest as an air carrier. In a September 30, 2009 letter to the United States Department of Transportation, RJET

---

[1] RAH completed this transaction through RJET Acquisition, Inc., a subsidiary created for this purpose.

-5-

requested registration of the trade name "Midwest Airlines" and notified the agency of its intent to conduct independent scheduled operations through Republic Airlines, Inc., under the "d/b/a" trade name Midwest Airlines. RJET also advised that it would cease scheduled airline operations under Midwest's FAA and DOT regulatory certificates as of November 3, 2009. Pursuant to Midwest's return-of-aircraft schedule with Boeing, the first of Midwest's nine remaining aircraft was taken out of airline service on September 1, 2009, and the fifth through last (ninth) were taken out of service on November 3, 2009. By November 13, 2009, all nine of the Midwest aircraft were physically returned to Boeing.

At RAH's direction, Midwest surrendered its Operating Certificate to the DOT and returned its International Air Transport Association (IATA) designator code of "YX" to that agency, whereupon Midwest ceased to exist as a separate air carrier. The "YX" code was then reissued to RAH so that it could operate Republic Airlines as "Republic Airlines d/b/a Midwest Airlines" (MWA). Since then, the in-flight management of MWA has consisted of the same management team previously at Republic, which has responsibility for all Midwest and Republic flight attendants and other employees. While winding down its operations, Midwest laid off the remaining complement of its flight attendants on a staggered basis from August 31, 2009 to December 4, 2009 in conjunction with the Midwest-Boeing return-of-aircraft schedule.

After Midwest was dissolved and ceased to exist as an air carrier, Republic hired a few of the former Midwest flight attendants to work as new hires. In so doing, Republic did not take into account those flight attendants' seniority under the AFA-Midwest collective

bargaining agreement, but instead decided on an individual basis which flight attendants to hire. Those that were hired were treated as new hires under the Republic/Chautauqua/Shuttle-IBT collective bargaining agreement. Additionally, Republic declined to hire several other former Midwest flight attendants. Approximately thirty former Midwest flight attendants ultimately were hired by Republic.

On September 14, 2009, the IBT filed an Application for Investigation of Representation Dispute with the National Mediation Board (NMB). NMB proceedings arising out of airline mergers are initiated by application of the employees of a particular craft or class (or their representative) seeking a determination that the merged entity constitutes a "single carrier" for purposes of the Railway Labor Act (RLA), which governs labor-management relations in the railroad and airline industries. 45 U.S.C. §§ 151, 151a, 181. The Teamsters alleged a representation dispute among the flight attendants at Chautauqua, Shuttle, Republic and Midwest, and also that the four airlines were operating as a single carrier known as Republic Airways Holdings, Inc. for purposes of representation.

On March 11, 2010, the NMB found that Chautauqua, Shuttle, and MWA were a single carrier for the craft or class of flight attendants. *In re Chautauqua Airlines*, 37 N.M.B. 148 (March 11, 2010), D. 10-20. Finding that the IBT represented a clear majority, and absent an application by any other organization to represent these employees, the Board extended the Teamsters' certification to cover all of the RAH flight attendants. *In re Republic*, 37 N.M.B. 174 (April 6, 2010), D. 10-21. The Teamsters' certification was

extended to include the former Midwest flight attendants, and the AFA's certification was terminated.

Acting on behalf of the former Midwest flight attendants, both AFA and the Committee sought seniority integration pursuant to McCaskill-Bond. RAH "supports the integration of the former flight attendants into the combined Chautauqua, Shuttle America and Republic Airlines flight attendant seniority list," but it will not proceed unless and until the Teamsters agree to participate as well. The Teamsters deny that the former Midwest flight attendants enjoy any right to a fair and equitable seniority integration under McCaskill-Bond.

**ANALYSIS**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The Civil Aeronautics Board (CAB), established in 1938, was the federal government agency responsible for carrying out various regulatory functions pertaining to the airline industry. As part of its functions, the CAB regulated corporate transactions between air

carriers, including mergers and acquisitions. In exercising this authority, the CAB developed and imposed certain labor protective provisions (LPPs). LPPs were standardized by the CAB in its 1972 decision involving the merger of Allegheny and Mohawk Airlines. Standard LPPs consisted of thirteen requirements or "sections" that provided generally for displacement allowances, health benefit protections, and, as pertinent here, the "equitable integration of transferring . . . employees into . . . seniority lists." *Ind. Union of Flight Attendants v. U.S. Dep't of Transp.*, 803 F.2d 1029, 1031 (9th Cir. 1986) (citing *United-Capital Merger Case*, 33 C.A.B. 307, 323-31, 342-47 (1961); *Allegheny-Mohawk Merger Case*, 59 C.A.B. 19, 31-40, 45-49 (1972)).

In 1978, Congress passed the Airline Deregulation Act (ADA), which "dramatically overhauled national aviation policy, rejecting the elaborate regulation of air carriers' business decisions that had traditionally marked that policy in favor of enhanced reliance on competitive market forces." *ALPA v. Dep't of Transp.*, 791 F.2d 172, 175 (D.C. Cir. 1986). Thereafter, the CAB refrained from imposing LPPs as "a matter of course," advising labor unions to "negotiate [their] own merge[r] protections through collective bargaining at the first opportunity." *In re Nat'l Airlines Acquisition*, 84 C.A.B. 408, 475 (1979). The DOT, which assumed the CAB's pre-ADA regulatory responsibilities, has not imposed LPPs since 1985.

The McCaskill-Bond Amendment was enacted in 2007, but its genesis was the labor strife that resulted from the 2001 operational merger of American Airlines and St. Louis, Missouri-based Trans World Airlines (TWA). In that transaction, American Airlines

-9-

purchased TWA's assets in a bankruptcy sale and eventually integrated the two airline carriers' operations and workforce. In so doing, American Airlines forced the TWA unions and the TWA employees that they represented to waive their contractual merger and acquisition protections. When the two airlines were integrated, most former TWA employees were "stapled" to the bottom of the combined seniority lists for their represented crafts, thereby resulting in the layoff of significant numbers of former TWA employees who had greater seniority than their counterparts at American Airlines. *Examining Certain Issues Relative to TWA/American Airline Workforce Integration: Hearing Before the Comm. on Health, Educ., Labor and Pensions*, 108th Cong. 5 (2003) (statement of Sen. Talent); *Bensel v. Allied Pilots Ass'n*, 675 F. Supp. 2d 493, 495 (D.N.J. 2009);

Missouri Senators Jim Talent and Christopher "Kit" Bond sought to intervene in the American Airlines-TWA transaction when they sponsored the Airline Workers Fairness Act of 2001. This legislation was never enacted, but it formed the blueprint for 2007's McCaskill[2]-Bond Amendment. McCaskill-Bond provides as follows:

> With respect to any covered transaction involving two or more covered air carriers that results in the combination of crafts or classes that are subject to the Railway Labor Act [] (45 U.S.C. 151 et seq.), *sections 3 and 13 of the labor protective provisions imposed by the Civil Aeronautics Board in the Allegheny-Mohawk merger* (as published at 59 C.A.B. 45) shall apply to the integration of covered employees of the covered air carriers.

49 U.S.C. § 42112, note, § 117(a) (emphasis added). Section 3 of *Allegheny-Mohawk* provides that if a merger "affects seniority rights of the carrier employees, provisions shall

---

[2] Claire McCaskill defeated Talent in 2006 and became the junior United States Senator from Missouri.

be made for the integration of seniority lists in a fair and equitable manner, including, where applicable, agreement through collective bargaining between the carriers and the representatives of the employees affected. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with section 13." 59 C.A.B. 45. Accordingly, if McCaskill-Bond applies, the former Midwest flight attendants are entitled to seniority integration proceedings.

Under McCaskill-Bond, a "covered transaction" is a "transaction for the combination of multiple air carriers into a single air carrier." § 42112, note, § 117(b)(4).[3] An "air carrier" is defined as an "air carrier that holds a certificate issued under chapter 411 of title 49, United States Code [49 U.S.C.A. § 41101 et seq.]." § 42112, note, § 117(b)(1). The Teamsters argue that RAH's July 2009 purchase of MAG was not a covered transaction because RAH and MAG are (or were) holding companies of certificated air carriers, not air carriers themselves. However, the amendment does not require that the transaction be *between* two air carriers. Instead, the amendment only requires that the transaction be "*for* the combination of multiple air carriers into a single air carrier." § 117(b)(4) (emphasis added). If it can be said that the transaction at issue was "for the combination of multiple air carriers into a single air carrier," (i.e., a "covered transaction") (discussed in more detail below), then it can also be said that the transaction was one "*involving* two or more covered air carriers . . ." § 117(a) (emphasis added); § 117(b)(2) (term "'covered air carrier' means

---

[3] A "covered transaction" under McCaskill-Bond also must involve "the transfer of ownership or control" of "50 percent or more of the equity securities . . . of an air carrier" or "50 percent or more (by value) of the assets of the air carrier." § 42112, note, § 117(b)(4). This portion of the statute is satisfied because it is undisputed that RAH acquired all of Midwest's assets and equity during the relevant transaction. Committee's Proposed Findings of Fact, ¶ 21.

an air carrier that is *involved* in a covered transaction") (emphasis added). The fact that the transacting parties were holding companies, not air carriers, is not dispositive.

The Teamsters also argue that the transaction was not "for the combination of multiple air carriers into a single air carrier" because RAH kept Midwest's operations separate until Midwest ceased operations in November 2009. Even if Midwest was operated separately for a period of time, RAH eventually combined Republic aircraft and management personnel with Midwest's brand name, routes, employees (except flight attendants) and code-share arrangements with other airlines. Midwest surrendered its certifications, and Republic Airlines became certified by the FAA and IATA to operate "Republic Airlines d/b/a Midwest" using Midwest's former "YX" designator code. Accordingly, multiple air carriers (Republic Airlines and Midwest Airlines), each with their own certificates under 49 U.S.C. § 41101, were ultimately combined into a single air carrier with one certificate – Republic Airlines d/b/a Midwest (MWA).[4] At that point, Midwest Airlines no longer existed as a separate air carrier. The Teamsters cannot seriously dispute that Republic Airlines and Midwest Airlines were eventually combined into one air carrier.

However, the foregoing does not necessarily mean that the RAH-MAG transaction was "a transaction *for* the combination of multiple air carriers into a single air carrier." For McCaskill-Bond to apply, it must be shown that the purpose of the transaction was to combine multiple air carriers into a single air carrier. Neither party adequately explores this

---

[4] *See* D. 17-1, Declaration of William Wilder, Exhibit A, October 5, 2009 Letter to NMB at 2 ("Once those steps are taken, [RAH] will surrender its 'RW' designator code currently possessed by Republic Airlines, one of its existing subsidiaries, and will request that IATA reissue [Midwest's] YX code to Republic Airlines. RAH will then seek permission to operate Republic Airlines as 'Republic Airlines d/b/a Midwest Airlines'").

facet of the statutory definition in their briefs and submissions. The Court can only note that there is evidence in the record supporting both sides of this issue. For example, RAH knew about Midwest's financial difficulties before purchasing MAG in July 2009. Presumably, RAH also knew that Midwest was due to lose its fleet of aircraft. These facts suggest that RAH purchased Midwest intending to eventually, if not immediately, combine Midwest Airlines and Republic Airlines into a single air carrier. On the other hand, the official stance at the time of the transaction was that Midwest would continue to operate as a branded carrier. It was not until *after* the transaction took place that RAH commissioned an independent financial advisory firm, which determined that Midwest was insolvent and would continue to lose money. Even if RAH was only confirming what it already knew before and at the time of the transaction, it is at least plausible that RAH purchased Midwest intending to continue operating it as a separate entity. Accordingly, there is a genuine issue of material fact regarding whether the purpose of the RAH-MAG transaction was to combine multiple air carriers into a single air carrier.

The Teamsters also argue that the transaction did not result in "the combination of crafts or classes that are subject to the Railway Labor Act" under McCaskill-Bond, § 42112, note, § 117(a), because the Midwest flight attendants were not fully employed by RAH after the merger. The logic of the Teamsters' position is flawed because it suggests that an employer could avoid McCaskill-Bond simply by refusing to employ a group of employees from the merging air carrier. More to the point, the NMB, within its exclusive jurisdiction, determined that *all* of the former Midwest flight attendants – including those that are

currently employed by Republic and those that are on furlough – are now part of the same "craft or class" of flight attendants employed by RAH subsidiaries. *In re Chautauqua*, 37 N.M.B. 148, 149 (March 11, 2010) ("The investigation establishes that Chautauqua, Shuttle, RA and Midwest (now MWA) are operating as a single transportation system (Republic) for the craft or class of Flight Attendants"); 45 U.S.C. § 152, Fourth (the "majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter"). Therefore, the transaction at issue resulted in the "combination of crafts or classes that are subject to the Railway Labor Act." The open question is whether the transaction was a "covered transaction," discussed *supra*.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** both motions for summary judgment [D. 8, 10] are **DENIED**. Answers are due in accordance with Fed. R. Civ. P. 12(a)(4)(A).

Dated at Milwaukee, Wisconsin, this 30th day of September, 2010.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**